# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### 1:14-cv-208

Karolyn Kruger, M.D., Candace Culton,　)
Frances Baillie, Eileen Schneider,　　　)
Judy Lewis, Linda Christensen, and　　)
Teresa Powell, individually and as　　　)
representatives of a class of similarly　　)
situated persons, and on behalf of the　　)
Novant Health Retirement Plus Plan,　　)
　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiffs,　　　)
　　　　　　　　　　　　　　　)　CLASS ACTION
　　　　　v.　　　　　　　　　)　COMPLAINT
　　　　　　　　　　　　　　　)
Novant Health, Inc., Administrative　　　)
Committee of Novant Health, Inc.,　　　)　Jury Trial Demanded
Novant Health Retirement Plan Committee, )
and John Does 1-40,　　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　)

## COMPLAINT

1.     Plaintiffs Karolyn Kruger, Candace Culton, Frances Baillie, Eileen Schneider,

Judy Lewis, Linda Christensen, and Teresa Powell individually and as representatives of

a class of similarly situated persons, bring this action pursuant to 29 U.S.C. § 1132(a)(2)

and (3) on behalf of the Tax Deferred Savings Plan of Novant Health, Inc. and the

Savings and Supplemental Retirement Plan of Novant Health, Inc. against Defendants

Novant Health, Inc., Administrative Committee of Novant Health, Inc., Novant Health

Retirement Plan Committee, and John Does 1-40 (unless separately identified, hereinafter

collectively referred to as "Novant Defendants").

2.      Novant Health, Inc. employees are offered a defined contribution retirement program known as the Retirement Plus Plan. The Retirement Plus Plan consists of two plans, the Tax Deferred Savings Plan of Novant Health, Inc. and the Savings and Supplemental Retirement Plan of Novant Health, Inc. As explained below, these two plans are offered to Novant employees as one retirement plan that is commonly referred to by Novant Defendants as the Retirement Plus Plan. Unless separately identified, the Retirement Plus Plan program is referred to herein as the "Plan."

3.      Plaintiffs allege that Defendants breach their duties under ERISA by causing the Plan to pay millions of dollars in excessive fees to third party service providers and by investing in imprudent investment options, thereby substantially reducing the retirement assets of Novant Defendants' employees and retirees who are participants in the Plan.

## JURISDICTION AND VENUE

4.      This court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

5.      This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found. It is also where a large number of Plan participants work and live.

## PLAINTIFFS

6.     Plaintiff Karolyn Kruger, M.D. resides in Kernersville, North Carolina and is a participant in the Plan. Dr. Kruger attended and graduated from the Wake Forest School of Medicine. Dr. Kruger served as chairman of the Physician Leadership Board and served as Director of a Hospitalist program at Novant Health Thomasville Medical Center. Dr. Kruger served as chief of staff and served as a physician representative on the board of Novant Health Thomasville Medical Center. Dr. Kruger resides and has resided in the greater Winston-Salem area for over thirty years and retired as a practicing physician in December 2011.

7.     Plaintiff Candace Culton resides and has resided in Winston-Salem, North Carolina for over forty years and is a participant in the Plan. For the past five years, Ms. Culton is, and for the past five years, has been an employee for Novant Health as a medical technologist.

8.     Plaintiff Frances Baillie resides in Winston-Salem, North Carolina and is a participant in the Plan. For five years Ms. Baillie served as a supervisor for a behavioral health unit for Novant Health. Ms. Baillie retired from Novant Health in January 2013.

9.     Plaintiff Eileen Schneider resides and has resided in Winston-Salem, North Carolina for over twenty-nine years and is a participant in the Plan. Ms. Schneider was a clinical social worker for Novant Health for over twenty years until 2009 and is presently retired.

10.     Plaintiff Judy Lewis resides in Lexington, North Carolina and is a participant in the Plan. Ms. Lewis worked at Novant Health auditing contracts with health insurance companies for thirteen years. Ms. Lewis retired in September 2013.

11.     Plaintiff Linda Christensen resides and has resided in Winston-Salem, North Carolina for over forty-one years and is a participant in the Plan. Ms. Christensen was a nurse for Novant Health for over twenty years.

12.     Teresa Powell resides and has resided in Winston-Salem, North Carolina for over thirty years and is a participant in the Plan. Ms. Powell worked for Novant Health as a social worker for over twenty-five years.

## DEFENDANTS

13.     Defendant Novant Health, Inc. is a North Carolina corporation organized to support its member hospitals, medical centers, outpatient surgery centers in North Carolina, South Carolina, and parts of Virginia (herein "Novant Health"). Employees of Novant Health and its member entities are doctors, nurses, medical assistants, support staff, and administrative staff who rely on Novant Health and the Plan it offers for their retirement savings.

14.     Novant Health is the sponsor of the Plan under 29 U.S.C. § 1002(16)(B), the administrator of the Plan under 29 U.S.C. § 1102(16)(A), and a party in interest to the Plan under 29 U.S.C. § 1002(14).

15.     Upon information and belief, Novant Health is a named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2).

16.     Further, Novant Health, acting through its board members, officers, directors, employees, or agents is and was a fiduciary to the Plan under 29 U.S.C. § 1002(21) because it exercises discretionary authority or discretionary control regarding management of the Plan, exercises authority or control regarding management or

disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan.

17.     Novant Health, as a corporate entity, cannot act on its own but acts through its board members, agents and employees. In this regard, on information and belief, Novant Health relies directly on its board members, officers, employees, internal departments, affiliates, subsidiaries, and the other Novant Defendants, named herein, to carry out its fiduciary responsibilities under the Plan and ERISA.

18.     Novant Defendants inform participants that the Plan is administered by an administrative committee (the "Administrative Committee") of Novant Health. Thus, upon information and belief, the Administrative Committee including its members, appointed by board members, whose identity has not been disclosed to Plaintiffs, and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, was and is an "administrator" of the Plan under 29 U.S.C. § 1002(16)(A) and is a fiduciary of the Plan under 29 U.S.C. §1102(a).

19.     Upon information and belief, the Administrative Committee is also a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan.

20.     Defendant John Does 1-20 are the individual members of the Administrative Committee, the identity of who have not been disclosed to Plaintiffs. Plaintiffs will substitute the real names of John Does 1-20 when they are discovered.

21.     On information and belief, the Retirement Plan Committee ("Retirement Plan Committee"), an entity whose members are appointed by board members of Novant Health to control the investments options that are included in the Plan, including its members, whose identity has not been disclosed to Plaintiffs, and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, was and is an "administrator" of the Plan under 29 U.S.C. § 1002(16)(A) and is a fiduciary of the Plan under 29 U.S.C. § 1102(a).

22.     The Retirement Plan Committee is also a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan.

23.     Defendant John Does 21-40 are the individual members of the Retirement Plan Committee, whose identity has not been disclosed to Plaintiffs. Plaintiffs will substitute the real names of John Does 21-40 when they are discovered.

### Novant Health Retirement Plus Plan

24.     Novant Health represents to its employees that they are participants in an ERISA-governed plan called the Retirement Plus Plan. In fact, the Plan is two separate

plans, the Tax Deferred Savings Plan of Novant Health, Inc. and the Savings and Supplemental Retirement Plan of Novant Health, Inc.

25.     All new employees of Novant Health are automatically enrolled in the Plan and the Plan serves as the primary retirement vehicle for Novant employees.

26.     The Tax Deferred Savings Plan of Novant Health, Inc. (herein "Tax Deferred Plan") is an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A) and an "individual account plan" or "defined contribution plan" under 29 U.S.C. § 1002(34).

27.     The Savings and Supplemental Retirement Plan of Novant Health, Inc. (herein "Savings Plan") is an "employee pension benefit plan" under 29 U.S.C. § 1002(2) and an "individual account plan" or "defined contribution plan" under 29 U.S.C. § 1002(34).

28.     The investment options in the two plans are identical and participants are instructed to select their investments for both plans. Generally, the Tax Deferred Plan is the retirement plan primarily designated for participants' contributions through salary deferrals and the Savings Plan is the retirement plan primarily designated for the employer matching contributions.

29.     In 2009, the Plan consisted of approximately 25,000 participants, and that number has not materially changed since that time.

30.     The amount of assets within a retirement plan have a great bearing on fees the market charges because higher level of assets enable a fiduciary to a plan to demand lower fees.

31.     In 2008, the Plan's total assets were approximately $612 million. By end of year 2009, the Plan grew by over 54%, totaling over $940 million. By 2012, the Plan's total assets increased by over 128% compared to year 2008, to over $1.42 billion.

32.     Novant Defendants, as the fiduciaries to the Plan, operating under the standard of prudent financial experts, are responsible for, among other things, the selection and monitoring of the investment options made available to Plan participants; the selection and monitoring of the service providers to the Plan; ensuring that all fees charged are reasonable; ensuring that a prudent process is employed in determining, among other things, the reasonableness of their decisions, the Plan's investments, and the fees paid by the Plan; avoiding conflicts of interest or self-dealing; and, operating for the exclusive benefit of Plan participants.

33.     Although Novant Defendants are required to engage in this deliberative process in their roles as fiduciaries, Plan participants are not privy to this information nor is this information disclosed to Plan participants.

34.     Great-West Life & Annuity Insurance Company (herein "Great-West") serves as a service provider to the Plan providing certain administrative and recordkeeping services. During the relevant time period, Great-West receives and has received payments from the Plan for its services.

35.     D.L. Davis & Company, Inc. (herein "Davis") is a brokerage company founded by Derrick L. Davis who, at all times relevant herein, serves as the chief executive officer and president of Davis. Since 1996, Derrick Davis has been a registered broker for MML

Investors Services, LLC which is a subsidiary of Massachusetts Mutual Life Insurance Company. During the relevant time period, Davis receives commissions from the Plan.

36.    As discussed in more detail below, since 2009 and continuing to this day, Novant Defendants determine what investment choices Plan participants have as investment options. The investment options in the Plan include approximately 20 mutual funds ("Mutual Funds"), three portfolio profile funds ("Profile Funds") consisting of investments in varying percentages in other investment options in the Plan, and a fixed account fund managed and offered by MML Investor, Inc, a subsidiary of Massachusetts Mutual Life Insurance Company.

37.    Novant Defendants represent to Plan participants that they are entitled, pursuant to rights and protections guaranteed by ERISA, to obtain copies of plan documents and other plan information by making a written request to the Chairman of the Administrative Committee for the Plan. Novant Defendants affirmatively state that this information will be provided within thirty days of being requested.

38.    On January 27, 2014, Plaintiff Kruger sent a written request, via certified mail with return receipt, to the Chairman of the Administrative Committee requesting a copy of the Plan document and the contract with Great-West (herein "Kruger Letter"). To date, despite being over thirty days since the date of her request, Plaintiff Kruger has not received a response from Novant Defendants.

### Investment Funds in the Plan

39.     As set forth below, the Mutual Funds and Profile Funds Novant Defendants provide Plan participants charge excessive fees, causing the Plan and its participants to overpay millions of dollars.

40.     Mutual fund companies often offer multiple classes for the same fund. For a fund with multiple classes, that fund invests in the identical portfolio of securities, has identical investment objectives, and has the identical investment manager.

41.     However, each class of the same fund has different fees and expenses. Although the holdings of such funds are the same, the performance of the funds with higher fees is lower than the fund with the lower fees.

42.     Mutual fund companies offer multiple class funds with varying fees because investors with substantial amounts of money to invest have economies of scale and bargaining power such that those investors, commonly referred to as "institutional investors", will not accept the fees that are charged to investors with only, for example, hundreds of dollars to invest, commonly referred to as "retail investors".

43.     Rather than offering a variety of different funds with different managers for the same investment style, mutual fund companies offer different share classes for the same funds that have the same manager. Generally, retail share class mutual funds are those funds that have investors who have only hundreds of dollars to invest and charge a higher fee than those lower fee share classes available to institutional investors, like defined contribution plans, with $1 million or more to invest.

44.     Fiduciaries to large defined contribution plans, such as the Plan, can use the asset size of their plans because large plans can obtain less expensive institutional rates.

45.     Fiduciaries have unique knowledge of the Plan's assets amounts in each investment option and thus are positioned to ensure the reasonableness of the fees. In this case, Plan participants do not have this information available to them nor are they in a position to demand less expensive institutional rates.

46.     For this reason, prudent retirement plan fiduciaries with large pools of retirement savings select these lower priced share class alternatives.

47.     In addition to institutional rate mutual funds, fiduciaries to large defined contribution plans can also reduce fees by purchasing comparable separately managed accounts. These types of accounts, available to large institutional investments, can have the identical investment style and managers as retail mutual funds, with fees commonly reduced to one-fourth of those retail mutual funds charge. Department of Labor, *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.

48.     The impact of lower fees is substantial. Indeed, even seemingly small differences in fee will have a dramatic impact on retirement assets over the course of a worker's career. See, e.g., Matthew O'Brien, *The Crushingly Expensive Mistake Killing Your Retirement*, THE ATLANTIC, Feb. 15, 2014 (illustrating how unnecessary fees reduce average 401(k) participant's lifetime savings by $159,000) (http://www.theatlantic.com/business/archive/2014/02/the-crushingly-expensive-mistake-killing-your-retirement/283866/).

**Plan participants are paying excessive fees for the
Plan's Mutual Funds and Profile Funds.**

A.  <u>Retail Mutual Funds</u>

49.     Despite the above, the Mutual Funds Novant Defendants provide in the Plan charge far higher fees than their readily available lower cost share class equivalents, institutional mutual funds, or separately managed accounts available to very large asset holders such as the Plan.

50.     Given the sharp increase in Plan assets that occurred in year 2009 and continued year after year, the Plan qualifies for those lower share class equivalents, as well as institutional mutual funds and separately managed accounts.

51.     For instance, as demonstrated below, with the funds in the Plan (Column A, D) and the fees charged by those funds (Column E), in 2012, Novant Defendants imprudently provided dramatically higher cost share classes for *every one* of the Mutual Fund Plan investment options (Column B, C). Indeed in some instances, the retail fees for the Mutual Funds were more than 100% higher than the identical institutional share class equivalent (Column F).

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Invesco Real Estate A | IARFX | 77 bps | IARAX | 125 bps | 62% |
| Columbia Seligman | SCMIX | 98 bps | SLMCX | 138 bps | 71% |
| Invesco Developing Markets A | GTDFX | 96 bps | GTDDX | 145 bps | 51% |
| Am. Funds Euro P Gr Fund A | RERFX | 55 bps | AEPGX | 86 bps | 56% |
| Thornburg International Value R3 | TGIRX | 76 bps | TGVRX | 145 bps | 91% |
| Baron Growth Fund | BGRIX | 106 bps | BGRFX | 132 bps | 34% |
| Royce Low Priced Stock Svc | RLPIX | 120 bps | RYLPX | 151 bps | 26% |
| Allianz NFJ Sm Cap Value A | PSVIX | 78 bps | PCVAX | 119 bps | 53% |
| Artisan Mid Cap Value Investor | APHQX | 101 bps | ARTQX | 120 bps | 19% |

| | | | | | |
|---|---|---|---|---|---|
| Franklin Sm Mid-Cap Growth - | FSGAX | 74 bps | FRSGX | 99 bps | 34% |
| Artisan Mid Cap Inv | APHQX | 101 bps | ARTMX | 133 bps | 32% |
| American Funds Growth Fund A | RGAGX | 34 bps | AGTHX | 71bps | 109% |
| Janus Forty Class S | JCAPX | 60 bps | JARTX | 104 bps | 73% |
| Mass Mutual Select Ind. Eq. S | MIEZX | 21 bps | MMIEX | 42 bps | 100% |
| Invesco Growth & Income A | ACGQX | 46 bps | ACGIX | 84 bps | 83% |
| American Funds Wash Mutual A | RWMGX | 31 bps | AWSHX | 62 bps | 100% |
| American Funds Income Fund A | RIDGX | 30 bps | AMECX | 59 bps | 97% |
| BlackRock Infl Protected Bond A | BPRIX | 43 bps | BPRAX | 86 bps | 100% |
| PIMCO Total Return Fund- Admin | PMBIX | 50 bps | PTRAX | 71 bps | 42% |

Column A – Name of Plan investment option
Column B – Institutional share class mutual fund ticker symbol identical to Plan retail fund except fees
Column C – Institutional share class fund fee (100 bps = 1%) readily available to the Plan
Column D – Retail share class mutual fund ticker symbol of fund in the Plan.
Column E – Retail share class mutual fund fee in basis points charged to the Plan
Column F – Fee Percentage excess between retail fee and institutional fee available

52.     For each of the above lower fee funds, the investment managers, investment

style and underlying fund investments were identical to the retail fee funds.

53.     The Plan's asset amounts were high enough to qualify for the lower fee fund.

Plan participants did not and do not know that the Plan's asset amounts in these funds

qualify for these lower fees, but Plan fiduciaries are required to be knowledgeable of such

matters.

54. Novant Defendants' failure to consider these lower fee funds has caused and is continuing to cause Plan participants to pay millions of dollars in excessive fees.

55. Novant Defendants' failure to consider how the material increase in Plan assets in 2009 and continuing thereafter cost Plan participants millions of dollars in excessive fees.

56. Separate from Novant Defendants' above failures, Novant Defendants are breaching their duties by failing to consider low-cost institutional funds and investments, including separate accounts, appropriate for a Plan of this size.

57. Given the massive bargaining power of a plan at or near $1 billion in total plan assets, a "large" plan in industry terms, prudent fiduciaries consider far lower cost investments that are accessible to institutional investors.

58. For instance, as demonstrated below, with the funds in the Plan (Column A, D) and the fees charged by those funds (Column E), in 2012, Novant Defendants imprudently provided dramatically higher cost share classes for *every one* of the Mutual Fund Plan investment options (Column B, C) compared to prudent low cost institutional equivalents available through low cost well respected Vanguard funds. Indeed in some instances, the retail fees for the Mutual Funds were over 1,000% higher than these low cost institutional equivalents (Column F).

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Invesco Real Estate A | VGSNX | 8 bps | IARAX | 125 bps | 1,463% |
| Columbia Seligman | VITAX | 14 bps | SLMCX | 138 bps | 886% |
| Invesco Developing Markets A | VEMIX | 12 bps | GTDDX | 145 bps | 1,108% |

| | | | | | |
|---|---|---|---|---|---|
| Am. Funds Euro P Gr Fund A | VTSNX | 12 bps | AEPGX | 86 bps | 856% |
| Thornsburg International Value R3 | VTSNX | 12 bps | TGVRX | 145 bps | 1,108% |
| Baron Growth Fund | VIEIX | 12 bps | BGRFX | 132 bps | 1,000% |
| Royce Low Priced Stock Svc | VSCIX | 8 bps | RYLPX | 151 bps | 1,788% |
| Allianz NFJ Sm Cap Value A | VSCIX | 8 bps | PCVAX | 119 bps | 1,388% |
| Artisan Mid Cap Value Investor | VIEIX | 12 bps | ARTQX | 120 bps | 900% |
| Franklin Sm Mid-Cap Growth - | VIEIX | 12 bps | FRSGX | 99 bps | 725% |
| Artisan Mid Cap Inv | VIEIX | 12 bps | ARTMX | 133 bps | 1,008% |
| American Funds Growth Fund A | VIGIX | 8 bps | AGTHX | 71 bps | 788% |
| Janus Forty Class S | VIGIX | 8 bps | JARTX | 104 bps | 1,200% |
| Mass Mutual Select Ind. Eq. S | VLISX | 8 bps | MMIEX | 42 bps | 425% |
| Invesco Growth & Income A | VIVIX | 8 bps | ACGIX | 84 bps | 950% |
| American Funds Wash Mutual A | VIVIX | 8 bps | AWSHX | 62 bps | 675% |
| American Funds Income Fund A | VBALX | 8 bps | AMECX | 59 bps | 638% |
| BlackRock Infl Protected Bond A | VIPIX | 7 bps | BPRAX | 86 bps | 1,129% |
| PIMCO Total Return Fund- Admin | VBTIX | 7 bps | PTRAX | 71 bps | 914% |

Column A –  Name of Plan investment option
Column B –  Vanguard Institutional share class mutual fund ticker symbol substantially similar Plan retail fund except fees
Column C –  Vanguard Institutional share class fund fee (100 bps = 1%)
Column D –  Retail share class mutual fund ticker symbol of fund in the Plan.
Column E –  Retail share class mutual fund fee in basis points charged to the Plan
Column F –  Fee Percentage excess between retail fee and Vanguard Institutional fee available

59.  Novant Defendants' failure to consider these low cost institutional funds, such as Vanguard, cost Plan participants millions of dollars in excessive fees.

60.     With the material increase in Plan assets in 2009 and continuing thereafter, Novant Defendants failed and continue to fail to consider institutional investment providers that cater specifically to large institutional investors like the Plan when those large investors have over four to five million dollars to investment in a fund.

61.     Given the size of the Plan in 2009 and continuing thereafter, Novant Defendants failed to inquire with institutional investment providers, like Vanguard, if those providers would waive the minimum investment amounts. When asked by fiduciaries to large institutional investors like the Plan, institutional investment providers, like Vanguard, will waive the investment minimum requirements.

62.     Novant Defendants' failure to consider how the material increase in Plan assets in 2009 and continuing thereafter cost Plan participants millions of dollars in excessive fees.

B.  Profile Funds

63.     Novant Defendants also failed to assess how these lower cost institutional funds could be used to avoid the excessive fees for the Profile Funds, costing Plan participants additional millions of dollars.

64.     The Profile Funds, the (i) Conservative Choice Profile Fund; (ii) Moderate Choice Profile Fund; and, (iii) Aggressive Choice Profile Fund charge Plan participants dramatically excessive fees as well.

65.     Each of the Profile Funds invests in varying percentages in the Plan's retail Mutual Fund options. Thus, they are groupings of retail mutual funds already in the Plan. For instance, in 2013, the five largest underlying investments in the Aggressive Choice

Profile Fund consisted of 13% in the American Funds EuroPacific (AEPGX), 12% in Thornburg International Value (TGVRX), 12% in American Funds Growth Fund (AGTHX), 12% invested in Mass Mutual Select Indexed Equity Fund (MMIEX), and 10% in Janus Advisor Forty (JARTX).

66.     The Profile Funds' fees are asset-weighted averages of the fees charged by the retail Mutual Funds in which the Profile Funds invest.

67.     Therefore, the dramatically excessive fees charged in the Plan's retail Mutual Funds are also charged in the Profile Funds.

68.     For instance, in 2013, the Conservative Choice Profile Fund charged a fee of 69 bps. If Novant Defendants utilize the institutional share class of the Mutual Funds, the Conservative Choice Profile Fund would only charge 43 bps.

69.     The Moderate Choice Profile fund charges a fee of 83 bps. If Novant Defendants utilize the institutional share class of the Mutual Funds, the Moderate Choice Profile Fund would only charge 51 bps.

70.      The Aggressive Choice Profile Fund charges a fee of 94 bps. If Novant Defendants utilize the institutional share class of the Mutual Funds, the Aggressive Choice Profile Fund would only charge 56 bps.

71.     For instance, as demonstrated below, with the Profile Funds in the Plan (Column A) and the fees charged by those funds (Column C), in 2012, Novant Defendants imprudently provided dramatically higher fees for *every one* of Profile Funds (Column B). Indeed in some instances, the Profile Funds' fees are as high as 68% higher than necessary (Column D).

| A | B | C | D |
|---|---|---|---|
| Conservative Choice Profile Fund | 43 bps | 69 bps | 60% |
| Moderate Choice Profile Fund | 83 bps | 51 bps | 63% |
| Aggressive Choice Profile Fund | 94 bps | 56 bps | 68% |

Column A –   Name of Plan investment option
Column B –   Institutional share class fund fee (100 bps = 1%) readily available to the Plan
Column C –   Retail share class fee in basis points charged to the Plan
Column D –   Fee Percentage excess between retail fee and institutional fee available

72.     Novant Defendants' failure to consider the lower fee Mutual Funds results in the Profile Funds charging Plan participants millions of dollars in excessive fees.

73.     Novant Defendants' failure to consider lower-cost alternatives for the Profile Funds is causing Plan participants to pay millions of dollars in excessive fees.

74.     Novant Defendants' failure to consider how the material increase in Plan assets in 2009 and continuing thereafter cost Plan participants millions of dollars in excessive fees.

75.     Separate from the above breaches, given the massive increase in Plan assets through the subsequent years, Novant Defendants' failure to consider lower cost investments cost Plan participants millions of dollars in excessive fees.

76.     This is because prudent fiduciaries regularly assess investment options and the amount of assets invested in each in order to determine access to lower fee investment alternatives. In particular, prudent fiduciaries consider separately managed accounts that offer dramatically lower fees than retail mutual funds and even institutional mutual funds.

77.     Despite the massive increase in Plan assets, each increase representing a material change in circumstances requiring a prudent fiduciary to monitor investments, Novant Defendants failed and continue to fail to consider lower cost investment alternatives for the Mutual Funds and the Profile Funds based on these massive increases in assets.

## GREAT-WEST'S SERVICES TO THE PLAN

78.     Great-West serves as a service provider to the Plan providing certain administrative and recordkeeping services.

79.     As the Plan's recordkeeper, Great West provides typical record keeping services to the Plan that other retirement plans with similarly-sized participant populations receive from other service providers like Great-West.

80.      Those services include the tracking and reporting of Plan participants' account balances, the provision of quarterly statements and other communications to Plan participants, the provision of on line Plan and account information, retirement planning tools, investment educational programs and call-in services.

81.     Upon information and belief, Great-West has provided recordkeeping services to the Plan since at least 2009 and these services have not changed in any material way since that time.

82.     Recordkeeping is a commodity service necessary for every defined contribution plan. Those costs can be the subject of requests for proposals to companies that provide recordkeeping services.

83.     As with any service provider providing recordkeeping services to a large retirement plan like the Plan, the cost of Great-West providing these recordkeeping services depend on the number of participants, not on the amount of money in participants' accounts. That is, the cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as the participant with $10,000 in her retirement account.

84.     For this reason, prudent fiduciaries to retirement plans with thousands of participants establish a fixed-fee arrangement that does not vary depending on the size of plan assets or individual participant accounts.

### Excessive payments by the Plan to Great-West

85.     By the same communications to all Plan participants, Novant Defendants represent to Plan participants that Novant pays for the recordkeeping services provided to the Plan.

86.     For retirement plans with total plan participants from 15,000 to 25,000 participants like the Plan for the services provided, a reasonable per capita fee paid by retirement plan participants should not exceed thirty-five dollars.

87.     Despite Novant Defendants' representations to Plan participants that Novant pays for the recordkeeping services, the Plan participants are paying these fees.

88.     In 2009, Great-West received direct compensation from the Plan for recordkeeping services in the total amount of $195,899.

89.     In 2010, Great-West received direct compensation from the Plan for recordkeeping services in the total amount of $2,439,926, an almost 1,200% increase from the previous year, without providing additional services.

90.     The 2010 payment by the Plan to Great-West is far in excess of a reasonable fee for these recordkeeping services.

91.     In addition, the vast increase in payments, over $2.2 million, by the Plan between 2009 and 2010 to Great-West is a material change in circumstances for the Plan and constitutes an excessive payment by the Plan for the services rendered by Great-West.

92.     Despite a reasonable per-capita fee for these services being no more than thirty-five dollars for a plan of this size in terms of total participants, the Plan paid almost ninety-eight dollars, or 180% higher than a reasonable fee for these services.

93.     Despite this material increase in fees paid by the Plan for these recordkeeping services, the services offered by Great-West did not change.

94.     Despite this material increase in fees paid by the Plan for these recordkeeping services, Novant Defendants failed to assess the reasonableness of these fees.

95.     In 2011, Great-West received direct compensation from the Plan for recordkeeping services in the total amount of $3,703,399.

96.     The 2011 payment by the Plan to Great-West is far in excess of a reasonable fee for these recordkeeping services.

97.     In addition, this substantial increase in payments, over $3.5 million from 2009 or almost 1,800%, by the Plan to Great-West is a material change in circumstances for

the Plan and constitutes an excessive payment by the Plan for the services rendered by Great-West.

98.     Despite a maximum reasonable fee per capita fee for these services being thirty-five dollars or lower, the Plan paid almost one hundred and fifty dollars, or 328% higher than a reasonable fee for these services.

99.     Despite this material increase in fees paid by the Plan for these recordkeeping services, the services offered by Great-West did not change.

100.    Despite this material increase in fees paid by the Plan for these recordkeeping services, Novant Defendants failed to assess the reasonableness of these fees.

101.    In 2012, Great-West received direct compensation from the Plan for recordkeeping services in the total amount of $2,277,606

102.    Less than three weeks after delivery of the Kruger Letter, Novant Defendants changed the reported amount that Great-West received as direct compensation from the Plan for recordkeeping services by showing it reduced to $2,255,411.

103.    Both the originally stated 2012 amount and the purported amended amount, paid by the Plan to Great-West are far in excess of a reasonable fee for these recordkeeping services.

104.    In addition, this substantial increase in payments, over $2 million more from 2009, by the Plan to Great-West is a material change in circumstances for the Plan and constitutes an excessive payment by the Plan for the services rendered by Great-West.

105. Despite a maximum reasonable fee per-capita for these services being thirty-five or lower, the Plan paid over ninety-one dollars, or 160% higher than a reasonable fee for these services

106. Despite this material increase in fees paid by the Plan for these recordkeeping services, the services offered by Great-West did not change.

107. Despite this material increase in fees paid by the Plan for these recordkeeping services, Novant Defendants failed to assess the reasonableness of these fees.

108. Separate from the above breaches stemming from the Plan's excessive direct payments to the Great-West, Novant Defendants failed to assess the reasonableness of any additional payments Great-West received from the investment companies of the Plan's investment options.

109. These additional payments or kick-backs, sometimes referred to as revenue sharing, from the managers of the Plan's investment options to Great-West provide an additional source of revenue to Great-West from Plan participants' accounts, thereby reducing their retirement assets.

110. Despite the cost of recordkeeping services having nothing to do with asset size, the amount of these kick-backs has increased greatly because the size of the assets in the Plan has increased greatly beginning in 2009.

111. These kick-backs are asset-based and are charged against the Plan participants' asset amounts in each investment option.

112. For this reason, prudent fiduciaries regularly assess the amount of this asset based revenue sharing, if it is even used as a method of paying a service provider, to determine the reasonableness of these fees.

113. Novant Defendants' failure to assess the reasonableness of this source of additional uncapped asset-based compensation to Great-West and allowed it to be uncapped, thereby adding to the already excessive amount of Great-West's fees paid by the Plan.

114. Separate from the above breaches, prudent fiduciaries regularly solicit competitive bids from prospective service providers, including recordkeepers, in order to assess the reasonableness of the fees charged by their selected recordkeeper.

115. Novant Defendants fail to request these bids from competitors of Great-West.

116. Novant Defendants' failure to request these bids results in Plan participants paying millions of dollars in excessive fees for recordkeeping.

### Excessive payments to D.L. Davis & Company

117. Despite Great-West providing the vast majority, if not all, of the administrative services to the Plan coupled with new Novant employees being automatically enrolled in the Plan, Davis purports to provide the Plan with limited marketing and enrollment services. In return for these nominal services, the Plan is paying Davis substantial commissions.

118. As set forth in the chart above at paragraph 51, the Mass Mutual Select Index Equity fund (MMIEX) is an excessively priced retail Mutual Fund in the Plan charging 100% more than the identical institutional fund (MIEZX).

119.    Davis is a registered broker of Mass Mutual's subsidiary, MML Investors

Services since 1996 and, upon information and belief, is receiving "commissions" from

this fund.

120.    In addition to the above, and as set forth below, the Plan is paying grossly

excessive fees in the form of "commissions" to Davis.

121.    In 2009 and 2010, Davis received commissions from the Plan in the total

amount of $827,885 and $779,028, respectively.

122.    In 2011, and despite Davis' limited services not changing in any material way,

Davis received commissions from the Plan in the amount of $1,992,897, more than

double the prior years.

123.    The 2011 payment by the Plan to Davis is far in excess of a reasonable fee.

124.    This substantial increase in payment, by over $155%, by the Plan between

2010 and 2011to Davis was a material change in circumstances for the Plan and

constitutes a grossly excessive payment by the Plan for the services rendered by Davis.

125.    Despite this material increase in fees paid by the Plan, Novant Defendants

failed to assess the reasonableness of these fees and allowed them to be paid reducing

Plan participants' retirement assets.

126.    In 2012, and despite Davis' services not changing in any material way, Novant

Defendants stated that Davis received commissions from the Plan in the total amount of

$5,999,056.

127.    Less than three weeks after delivery of the Kruger Letter, Novant Defendants changed the reported amount that Davis received as direct commissions from the Plan by showing it reduced to $3,743,927.

128.    Both the originally stated 2012 amount and the purported amended amount paid by the Plan to Davis are far in excess of a reasonable fee for these services.

129.    This substantial increase in payment, by over 670% or 380% according to the altered amount, by Plan participants between 2010 and 2012 to Davis was a material change in circumstances for the Plan and constitutes a grossly excessive payment by the Plan for the services rendered by Davis.

130.    Despite this material increase in fees paid by the Plan, Novant Defendants failed to assess the reasonableness of these fees.

131.    Upon information and belief these excessive payments continue to this day.

132.    Although Davis' 2009 and 2010 payments were far in excess of what similarly sized retirement plans paid in commissions to brokers, the commissions Davis received in 2011 and 2012 are grossly in excess of not only its previous commission amounts but, by comparison, dwarfs what similarly sized plans pay for brokerage services.

133.    Separate from the above breaches stemming from the Plan's excessive commission payments to Davis, Novant Defendants failed to assess the reasonableness of any additional payments Davis received from the investment companies of the Plan's investment options.

134.    These additional payments or kick-backs from the managers of the Plan's investment options to Davis provide still another source of revenue from Plan

participants' accounts. For instance, and upon information and belief, Davis is receiving additional compensation from the fixed account fund managed offered by MML Investor, Inc., Mass Mutual's subsidiary.

135.    The amounts of these kick-backs are solely dependent on the fee charged against the Plan participants' asset amounts in each investment option.

136.    For this reason, prudent fiduciaries regularly assess the amount of these kick-backs to determine the reasonableness of these fees.

137.    Novant Defendants failure to assess the reasonableness of this source of additional compensation to Davis is thereby adding to the already excessive amount of commissions paid by the Plan to Davis.

138.    Separate from the above breaches, prudent fiduciaries regularly solicit competitive bids from prospective service providers, including brokers, in order to assess the reasonableness of the fees.

139.    Novant Defendants failed and continue to fail to request these bids from competitors of Davis.

140.    The relationship between Novant Defendants and Davis runs much deeper than Davis receiving commissions from the Plan.

141.    Davis receives payments from other Novant Health qualified plans including Novant's employees' vision, accidental, life, long term disability, temporary disability, and long-term care plans.

142.    In addition to these payments, Davis receives compensation from the Novant employees' defined benefit plan known as the Pension Restoration Plan of Novant

Health, Inc. ("Novant Restoration Plan") whose primary service provider is Massachusetts Mutual Life Insurance Company, of which Davis has been a registered broker of its subsidiary, MML Investors Services since 1996. Upon information and belief, Davis received substantial payments from this relationship as well.

143.    In addition to the above, Mr. Davis' relationship with Novant Health is further established in that he is a member of the Board of Directors of Novant Health's Forsyth Medical Center.

144.    Apart from Davis' extensive relationship with Novant in receiving payments from Novant's employees' plans, Derrick Davis has an extensive business and land development relationship with Novant Health, including companies owned, controlled, or substantially invested in by Mr. Davis which have entered into land development projects and office building leasing arrangements in the greater-Winston-Salem area with Novant Health.

145.    Although Mr. Davis is an officer, manager and/or owner of these development companies, none of these development companies operate as "D.L. Davis & Company". Rather, these companies operate under a variety of different names such as Blue Diamond Investment Company (herein "Blue Diamond) and East Coast Capital Partners LLC (herein "East Coast Capital"). The relationship between these Davis companies and Novant Health is substantial.

146.    For instance, near the same time Mr. Davis provided Novant Health a gift in excess of $5 million, a Davis-owned development company, East Coast Capital announced the plans of a large business development known as the Southeast Gateway.

Part of this project included Novant Health occupying 40,000 square feet of this office development for a call center.

147.    Also, another Davis related company, Blue Diamond, purchased and later sold to Novant hundreds of acres of land that would ultimately become the site of the Novant Health Kernersville Medical Center. To this day, Blue Diamond continues to own and develop adjacent land to this development, known as "Patriot's Crossing", in tandem with Novant Health to the benefit of Blue Diamond, and benefits from the presence of the adjacent Novant medical center.

## FRAUD AND CONCEALMENT

148. Novant Defendants consistently and fraudulently concealed their breaches of fiduciary duty, and concealed others' breaches, with respect to: the excessive fees paid by the Plan for the administrative and recordkeeping services; and, the inappropriate share class of the Mutual Funds.

149. For example, Novant Defendants informed Plan participants through standard Plan-wide newsletters, including a November 2012 publication, that the participants paid no annual recordkeeping fees for the Plan and that Novant "picks up the tab" for these fees.

150. Further, in standard presentations and statements made to Plan participants, Novant Defendants stated that "the checks for all administrative expenses are written by Novant."

151. These statements falsely led participants to believe that there were no fees paid by the Plan for Great-West's services or Davis' services.

152. Further, Novant Defendants represented to Plan participants in standard presentations and communications that "due to the large asset amounts in the Plan" and the Plan's investments in "A" share class Mutual Funds, certain fees were waived, thereby leading Plan participants to believe that the Plan was invested in the appropriate share class of the Mutual Funds.

153. Further, until late 2013, Novant concealed the amount of assets held in the mutual fund and Profile options such that participants were unable to determine the

Plan's ability to access lower share class mutual funds or alternative lower-cost

investment products.

## ERISA'S FIDUCIARY STANDARDS

154. As alleged above, and as Novant Defendants concede, the Plan is a retirement

plan as defined by ERISA and thus must be administered in accordance with ERISA.

155. ERISA imposes strict fiduciary duties of loyalty and prudence upon Novant

Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

> (A)      for the exclusive purpose of

> (i) providing benefits to participants and their beneficiaries; and

> (ii) defraying reasonable expenses of administering the plan; [and]

> (B)      with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

156. ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C.

§ 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this

> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary

> responsibility of another fiduciary with respect to the same plan in the

> following circumstances:

(1)        if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)        if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)        if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

157. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

158. The Department of Labor has explained:

To act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable

investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Adv. Op. No. 88-16A.

159. A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DOL Adv. Op. No. 98-04A; DOL Adv. Op. No. 88-16A.

160. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary, such as Novant, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

161.    Despite these demanding duties and obligations, the highest known to law, Novant Defendants breached and are continue to breach these duties causing the Plan and its participants to incur substantial losses. These breaches continue to this day.

## CLASS ALLEGATIONS

162.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).

163.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan from January 1, 2009, through date of judgment and to represent that class. This action is certifiable as a class action for the following reasons:

a.    The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.    The acts and omissions of Novant Defendants, as set forth above, were performed regarding the Plan as a whole rather than performed differently as to individual participants.

c.    The investment fund lineup is the same for all Plan participants as are the expense ratios for each fund in the Plan.

d.    The participant communications from Novant Defendants are the same for each Plan participant.

e.     There are questions of law and fact common to this Class because the Novant Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and acted as alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and, what non-monetary relief should be accorded to the Plan as a whole.

f.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action.

g.     Plaintiffs will adequately protect the interests of the Class because they have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class. Plaintiffs' attorneys have agreed to advance the costs of this action contingent upon the outcome and are aware that no fee can be awarded without the Court's approval.

h.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Novant Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29

U.S.C. § 1109(a) and (B) adjudications by individual participants and beneficiaries regarding these breach of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore this action should be certified as a class action under Fed.R.Civ.P. 23(b)(1)(A) or (B).

164.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Fed.R.Civ.P. 23(b)(3) if it cannot be certified under Fed.R.Civ.P. 23(b)(1)(A) or (B).

## COUNT I
### Disloyalty and Imprudence as to Excessive Investment Options
### (All Novant Defendants)

165.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

166. Novant Defendants are and were fiduciaries to the Plan under 29 U.S.C. § 1102(a)(1), and each of the Novant Defendants are and were fiduciaries under 29 U.S.C. § 1002(21).

167. The scope of the fiduciary duties and responsibilities of the Novant Defendants includes discharging their duties with loyalty, care, skill, diligence, and prudence required by ERISA.

168. Novant Defendants are further required to act with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

169. Novant Defendants are required to monitor Plan investment options, eliminating imprudent options, evaluating the merits for the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

170. Given the material changes that occurred in 2009 and thereafter as set forth above, Novant Defendants breached their duties by retaining the higher fee share class investment options in the Plan when far lower cost funds with the identical managers, investments styles, and stocks were available.

171. Novant Defendants breached their fiduciary duties by failing to consider those lower cost funds with the identical managers, investments styles, and stocks where available.

172.  Novant Defendants' process of evaluating the reasonableness of the investment options was and is imprudent.

173.  Further, given those material changes, Novant Defendants breached their duties by failing to consider lower cost institutional investments, like those offered by Vanguard.

174.  Further, given those material changes, Novant Defendants breached their duties by failing to consider low cost institutional investments, like collective trusts or separate accounts.

175.  As set forth above, by failing to consider these far lower cost investment alternatives, Novant Defendants did not discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan and instead acted for the purpose of benefitting Novant Defendants through providing significant sources of compensation to the Plan's service providers including Davis and Great-West. Novant Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A).

176.  Novant Defendants did not discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Novant Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(B).

177.    Novant Defendants failed to engage in a prudent process for the retention of Plan investment options in light of the material changes that occurred. Such an investigation would have revealed to a reasonably prudent fiduciary that the retail share class investments in the Plan became imprudent and retained for reasons other than the best interest of the Plan and plan participants and beneficiaries and were and are causing the Plan to waste millions of dollars of participants' retirement savings in excessive and unreasonable fees.

178.    Novant Defendants failure to consider alternative investments and retaining the higher cost retail share class funds caused the Plan to sustain underperformance damages.

179.    In particular, and for example only, if Novant Defendants had replaced Royce Low Priced Stock (RLPIX), American Funds Growth (RGAGX), and Janus Forty Class S (RGAGX) with the highly respected Vanguard Institutional equivalent funds, the Plan would have avoided millions of dollars in underperformance.

180.    Each Novant Defendant is personally liable, and the Novant Defendants are jointly and severally liable, under 29 U.S.C. § 1109(a) to make good to the Plan the losses to the Plan resulting from the aforementioned breaches and to restore to the Plan any profits of such Novant Defendant made through the use of Plan assets. Each Novant Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy

the breach, and thus is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

181.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendants are liable to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits they received as a result of the breaches of fiduciary duties alleged in this Count, and to provide other equitable relief as appropriate.

**COUNT II**
**Disloyalty and Imprudence as to Excessive Payments to Great-West**
**(All Novant Defendants)**

182.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

183.    Novant Defendants were fiduciaries to the Plan under 29 U.S.C. § 1102(a)(1), and each of the Novant Defendants were fiduciaries under 29 U.S.C. § 1002(21).

184.    Great-West received compensation from the Plan for its administrative and record keeping services in the form of direct payments from the Plan.

185.    In 2010 and continuing, the compensation Great-West received from the Plan increased dramatically, such that a material change occurred in the administration of the Plan and the level of payment of these services.

186.    The compensation that Davis received for these services was excessive and unreasonable, and Defendants breached their fiduciary obligations under 29 U.S.C. § 1104(a)(1).

187. The excessive compensation Great-West received does not include additional sources of compensation Great-West received as a result of the Plan including indirect payments from the Plan, and the Plan's investment options, or the Plan's other service providers, including Davis.

188. Novant Defendants failed to monitor Great-West's compensation to ensure that those payments provided no more than reasonable compensation, failed to recover for the Plan the amount of revenue Great-West received that exceeded a reasonable fee for the type of services it provided, and failed to put the recordkeeping services out for competitive bidding.

189. Novant Defendants also failed to have a prudent process for evaluating the reasonableness of this compensation paid by the Plan.

190. Novant Defendants failed to monitor any indirect payments Great-West received from Plan investments to ensure that those payments provided no more than reasonable compensation, failed to recover for the Plan the amount of those payments that exceeded a reasonable recordkeeping fee, and failed to negotiate a specific recordkeeping fee for the Plan that was reasonable for the services rendered.

191. Novant Defendants breached their duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a), and cost the Plan millions of dollars in excessive administrative fees paid to Great-West.

192. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Novant Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, as well as any other equitable or remedial relief the Court deems appropriate.

## COUNT III
## Disloyalty and Imprudence as to Excessive Payments to Davis
## (All Novant Defendants)

193.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

194.    Novant Defendants are fiduciaries to the Plan under 29 U.S.C. § 1102(a)(1), and each of the Novant Defendants are fiduciaries under 29 U.S.C. § 1002(21).

195.    The scope of the fiduciary duties and responsibilities of the Novant Defendants includes discharging their duties with loyalty, care, skill, diligence, and prudence required by ERISA.

196.    Novant Defendants are further required to act with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

197.    Davis received compensation from the Plan for its purported marketing services in the form of direct payments or commissions from the Plan.

198.    In 2011 and continuing, the compensation Davis received from the Plan increased dramatically, such that a material change occurred in the administration of the Plan and the level of payment of these services.

199.    The compensation that Davis received for these minimal services was excessive and unreasonable, and Novant Defendants breached their fiduciary obligations under 29 U.S.C. § 1104(a)(1) and 1103(c)(1). The excessive compensation Davis received does not include additional sources of compensation Davis received as a result

of the Plan including any indirect payments Davis received from the Plan and the Plan's investment options.

200.    Novant Defendants failed to monitor Davis' compensation to ensure that those payments provided no more than reasonable compensation, failed to recover for the Plan the amount of revenue Davis received that exceeded a reasonable fee for the nominal services Davis provided and failed to put the services Davis provided out for competitive bidding.

201.    Novant Defendants also failed to have a prudent process for evaluating the reasonableness of this compensation to Davis.

202.    Novant Defendants also breached their duty of loyalty to participants in allowing Davis to receive excessive fees in order to sustain the business outside relationships with Davis.

203.    Instead of evaluating the value and cost of these services in the marketplace, Novant Defendants permitted Davis to receive this compensation from the Plan in exchange for the close business relationship between Davis and Mr. Davis' related companies with Novant in regard to the land and business development agreements, and real estate ventures.

204.    Novant Defendants breached their duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a), and cost the Plan millions of dollars in excessive payments to Davis.

205.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Novant Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, as well as any other equitable or remedial relief the Court deems appropriate.

**COUNT IV**
**Failure to Monitor Fiduciaries**
**(All Novant Defendants)**

206.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

207.    This Count alleges breach of fiduciary duties against the Novant Defendants.

208.    As alleged above, the Novant Defendants are fiduciaries to the Plan. Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

209.    As alleged above, the scope of the fiduciary responsibilities of the Novant Defendants includes the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries.

210.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

211.    Novant Defendants breached their fiduciary monitoring duties by, among other things:

a. failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan

suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Plan;

b. failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the widespread use of investment options with excessive fees and service providers receiving excessive fees;

c. failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing investments that charged significantly lower fees and expenses; and

d. failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent options for participants' retirement savings in the Plan during the Class Period, and who breached their fiduciary duties under ERISA.

212.    As a consequence of Novant Defendants' breaches of fiduciary duty, the Plan suffered substantial losses. If the Novant Defendants had discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

213.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Novant Defendants are liable to restore the losses to the Plan caused by their breaches of

fiduciary duties alleged in this Count, and Counts I, II, and III, and to provide other

equitable relief as appropriate.

## COUNT V
### Novant Defendants Knowingly Participated in Breaches of Fiduciary Duties
### (All Novant Defendants)

214.    Plaintiffs incorporate the allegations contained in the previous paragraphs of

this Complaint as if fully set forth herein.

215.    This Count alleges co-fiduciary liability against Novant Defendants.

216.    At all relevant times, Novant Defendants were fiduciaries to the Plan for all the

reasons stated above.

217.    Novant Defendants, by their actions in participating in and abetting fiduciary

breaches, are causing the Plan to remain invested in imprudent investment options, to pay

excessive fees for those investment options and to pay excessive fees to service

providers.

218.    As a direct result of Novant Defendants' violations of ERISA, the Plan, and the

Plan's participants and beneficiaries, including Plaintiffs, lost millions of dollars.

219.    Pursuant to 29 U.S.C. § 1132(a)(3) Novant Defendants are is liable for those

losses.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

220.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for

appropriate relief under 29 U.S.C. § 1109. Section 1109 requires "any person who is a

fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to

such plan any losses to the plan…" Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate…"

221.     With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investments and, instead, prudent fiduciaries would have invested the Plan's assets in prudent alternative investments available to them. Therefore, the Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

222.     Plaintiffs and the Class are therefore entitled to relief from the Novant Defendants in the form of: (a) a monetary payment to make good to the Plan the losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3); (c) reasonable attorneys' fees and expenses, as provided by 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs and interest on these amounts, as provided by law; and (e) such other legal or equitable relief as may be just and proper.

223.     Under ERISA, each Novant Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## JURY TRIAL DEMANDED

224.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States,

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

- Find and declare that the Novant Defendants breached their fiduciary duties as described above;

- Find and adjudge that Novant Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- Award actual monetary losses to the Plan;

- Order equitable restitution and other appropriate equitable monetary relief against Novant Defendants;

- Order the permanent removal of Novant Defendants from any positions of trust with respect to the Plan;

- Order Novant Defendants to render an accounting;

- Surcharge against Novant Defendants and in favor of the Plan all amounts involved in transactions that such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- Enjoin Novant Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

- Order the appointment of an independent fiduciary to administer the Plan;

- Order rescission of the Plan's investments in the higher fee share class options and order a process for the selection of investment options in the Plan;

- Order rescission of the Plan's contracts or agreements with Davis and Great-West for their services to the Plan and (i) a bidding process for selection of a Plan record-keeper; and, (ii) the determination as to the necessity of any marketing services necessary for the Plan.

- Order that this action be certified as a class action and that the Class be designated to receive the amounts restored or disgorged to the Plan by Defendants and a constructive trust be established for distribution to the extent required by law;

- Award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the Common Fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Award such other and further relief as the Court deems equitable and just.

Respectfully Submitted,

Dated:   March 12, 2014

**ELLIOT MORGAN PARSONAGE, P.A.**

/s/ Robert M. Elliot
Robert M. Elliot (7709)
426 Old Salem Road
Winston-Salem, North Carolina 27101
(336) 724-2828
(336) 724-3335 (Fax)
rmelliot@emplawfirm.com


**SCHLICHTER, BOGARD & DENTON**

Jerome J. Schlichter (*pro hac vice* pending)
Michael A. Wolff (*pro hac vice* pending)
Troy A. Doles (*pro hac vice* pending)
Heather Lea (*pro hac vice* pending)
100 South Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com